# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# JONESBORO DIVISION

TINA MARIA YANDELL                                               PLAINTIFF

v.                      No. 3:16-CV-00132-JTR

NANCY A. BERRYHILL,
Acting Commissioner,
Social Security Administration                             DEFENDANT

## ORDER REMANDING TO THE COMMISSIONER
## FOR AN AWARD OF BENEFITS

Tina Yandell ("Yandell") applied for supplemental security income, alleging disability beginning May 1, 2004. (R. at 18).

On April 21, 2007, an administrative law judge ("ALJ") denied her application. (R. at 122-28). On October 3, 2008, the Appeals Council remanded the claim for the ALJ to properly consider Yandell's subjective complaints, to provide rationale and evidentiary references for his decision, and to develop the record regarding Yandell's mental impairments. (R. at 101–02).

On June 2, 2009, Yandell's application was again denied by an ALJ. (R. at 108-17). On February 17, 2011, the Appeals Council remanded because the administrative record could not be located or reconstructed. (R. at 96-97).

On February 24, 2012, a third ALJ denied Yandell's claim. (R. at 47-58). On November 16, 2012, the Appeals Council dismissed Yandell's request for review,

1

erroneously finding that it was untimely. On September 16, 2014, the Appeals Council vacated the dismissal, granted the request for review, and remanded the ALJ's decision because it relied on "unavailable medical exhibits" and improperly adopted the 2009 ALJ's evaluation of that evidence. (R. at 61-63). In its order, the Appeals Council stated that it "regrets the [two year] delay involved," which was caused by the Appeals Council's *erroneous dismissal* of Yandell's request for review. (R. at 62).

On April 28, 2015, a fourth ALJ denied Yandell's claim for disability benefits. (R. at 18–33). This time, the Appeals Council denied her request for review, making the ALJ's decision the Commissioner's final decision. (R. at 8) On May 16, 2016, Yandell filed this Complaint requesting judicial review.[1]

For the reasons stated below, the Court reverses and remands the Commissioner's decision, and orders the Commissioner to award Yandell disability benefits.

I. **The Commissioner's Decision**

The ALJ found that Yandell had the following severe impairments: history of a fracture of her right femur, status post closed reduction, internal nailing of her right femur; lumbago; arthritis; post-traumatic stress disorder ("PTSD"); major depressive disorder; and anxiety disorder. (R. at 20). Based on those impairments,

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge.

the ALJ determined that Yandell had the residual functional capacity ("RFC") to perform sedentary work, with the following additional limitations: occasional stooping and no crouching, crawling, kneeling, or climbing; no balancing or exposure to hazards such as unprotected heights, moving machinery, and open flames; the use of a cane in her dominant arm to balance or ambulate from her workstation; only work where interpersonal contact was incidental to the work performed, *i.e.*, interpersonal contact involving only limited interaction with others, such as meeting and greeting the public, answering simple questions, accepting payment and making change; work where tasks are restricted to a degree of complexity that can be learned by demonstration or repetition within 30 days, and that involve few variables and little judgment; and work that involves simple, direct, and concrete supervision. (R. at 22).

Yandell had no past relevant work. (R. at 31). After considering testimony from a vocational expert, the ALJ determined that Yandell could perform unskilled sedentary jobs such as final assembler/optical goods or document preparer. (R. at 32). Accordingly, the ALJ held that Yandell was not disabled. (R. at 32–33).

## II. Discussion

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see*

*also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

Yandell argues that the ALJ erred by failing to properly consider the opinion of her long-time treating physician, Darrell Hutchison, M.D. The Court agrees.

A treating physician's opinion generally is afforded controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016). If the opinion is not given controlling weight, then the ALJ must review various factors to determine how much weight is appropriate. *Julin,* 826 F.3d at 1088. Opinions of treating physicians "typically are entitled to at least substantial weight," but may be given limited weight if they are conclusory or inconsistent with the record. *Id.* An ALJ must "always give good reasons" for the weight afforded a treating physician's opinion. 20 C.F.R. § 416.927(c)(2).

On January 20, 2015, Dr. Hutchison completed a Medical Source Statement-Physical ("MSS"), opining that Yandell: (1) could only lift less than ten pounds; (2)

4

could sit for a total of only two hours during an eight-hour workday; (3) could stand/walk less than two hours during the workday, and could not stand/walk for more than fifteen minutes without a break; (4) would need to shift at will from sitting or standing/walking; (5) would need frequent rest periods and longer than normal breaks; (6) could not reach; (7) could perform frequent fingering/handling; (8) would frequently need to be redirected to remain on task; (9) must avoid all exposure to temperature extremes, high humidity, fumes, odors, dust, and gas; must avoid moderate exposure to soldering fluxes, chemicals, and sunlight; and must avoid concentrated exposure to solvents/cleaners; and (10) would miss more than three days of work per month as a result of her impairments. (R. at 522-23).

In his decision, the ALJ found Dr. Hutchison's January 20, 2015 opinion "not to be persuasive" in light of "the overall record." (R. at 30). To support this conclusion, the ALJ made the following findings, *none of which are factually correct*: (1) Dr. Hutchison's opinion "seemed excessive and inconsistent with treatment records"; (2) his treatment of Yandell "seemed to be essentially routine and/or conservative in nature"; (3) he "did not explain or justify" his opinion with any clinical findings; and (4) he "seemed to uncritically accept as true" Yandell's subjective complaints. (R. at 30). Suffice it to say, *nothing* in the record supported the ALJ's decision to reject the opinion of Yandell's long-time treating physician.

First, the ALJ claimed that Yandell "seemed" to receive only routine, conservative care from Dr. Hutchison. Yandell had an extensive treatment history with Dr. Hutchison, who was her long-time primary care physician. He began treating her in September 2008, four years after she had suffered multiple fractures, lacerations and other injuries in a serious car accident. At the time of the accident in 2004, she underwent surgery to repair her fractured right femur, and a rod was inserted in her leg. In the years after the accident, she developed PTSD, depression and anxiety, and continued to suffer chronic pain in her lower back and hips, and pain and numbness in her legs and arms.[2]

Between September 2008 and January 2015, Dr. Hutchison treated Yandell at least twenty-five times. *See Doc. 15 at 11-15* (summarizing treatment). In 2008, 2009 and 2010, he treated her primarily for chronic back pain and depression, prescribing Flexeril (a muscle relaxant) and Naproxen (a non-steroidal anti-inflammatory drug). (R. at 368-80). In the fall of 2011, Yandell began reporting pain, swelling and stiffness in her fingers and right hand, as well as continued back and hip pain. Dr. Hutchison diagnosed lumbago and arthritis, and changed her anti-inflammatory medication. (R. at 361-63, 408-09).

---

[2]Before the car accident, Yandell injured her back while at work. She also had a prior hip injury, which required insertion of a steel plate. (R. at 244).

In March 2012, Yandell complained of bilateral hip pain, back pain, and pain, swelling and stiffness in her right hand. She reported difficulty going to the bathroom, dressing and lying down, with little relief from her medications. Dr. Hutchison prescribed hydrocodone in addition to her other medications. (R. at 448-50). He also ordered a CT scan of her lumbar spine. It showed an anterior disc protrusion with osteophytes at L3-4 and a disc bulge with facet and ligamentous thickening at L4-5. (R. 447).

In June and September 2012, Yandell complained of chronic back and hip pain, and she was using a cane. Dr. Hutchison continued her medications, including hydrocodone. (R. at 440-46). In November 2012, she reported that she was unable to sit in the same position for prolonged periods due to pain. Her medications were continued. (R. at 432-34).

In May 2013, Yandell reported low back pain, numbness in her left leg, and shooting pain in both legs. Dr. Hutchison's physical exam showed bilateral foot drop, weakness in the lower extremities, antalgic gait, use of a cane to ambulate, and tenderness in the lumbar region. Yandell said she was unable to go see a neurosurgeon due to lack of insurance. (R. at 429-31).

On July 16, 2013, Yandell went to the hospital emergency room, reporting the sudden onset of pain in her back and both hips, legs and feet. She was given an injection of Toradol. (R. at 462-89). A CT of the lumbar spine showed degenerative

changes with a lateralized disc bulge at L3-4 on the left and mild disc bulges at L4-5 and L5-S1. (R. at 480).

In October 2013, Dr. Hutchison treated her for "worsening" pain in her lower back and feet. He again diagnosed lumbago and arthritis, and he renewed her pain medication prescriptions. (R. at 419-22).

In May 2014, Yandell reported chronic worsening back pain, and decreased function in both hands, with sharp pains and numbness. Dr. Hutchison diagnosed carpal tunnel syndrome and ordered nerve conduction studies. He continued to prescribe hydrocodone and an anti-inflammatory. (R. at 415-17). In August, November and December 2014, her diagnoses and medications were unchanged. Physical exams showed lumbar paraspinal tenderness, which required Yandell to take pain medication to help get her through the days. (R. at 412-14, 455-60).

The record clearly reflects that Yandell's impairments initially resulted from a serious motor vehicle accident in 2004, which necessitated surgical intervention and led to years of continued chronic pain and other symptoms for which she regularly sought and received treatment from Dr. Hutchison and others. Although the post-surgical care rendered by Dr. Hutchison was initially conservative, his treatment intensified as Yandell's symptoms and limitations worsened. He adjusted her anti-inflammatory medication, then added a narcotic for pain, which he

continued to prescribe for at least three years. He ordered diagnostic testing, and they discussed consultation with a neurosurgeon.

*Notwithstanding the escalating long-term medical treatment Yandell received from Dr. Hutchison for these chronic conditions, the ALJ characterized this as "routine and/or conservative" care, something that simply is not true.*

In discrediting Dr. Hutchison's opinion, the ALJ also stated that Dr. Hutchison relied on no clinical data "other than a positive straight leg raise." (R. at 30). However, Dr. Hutchison expressly stated in the MSS that he was relying on the following "objective medical findings": bilateral positive straight leg raise of 15 degrees, difficulty walking, and bilateral weakness in the lower extremities. (R. at 523). Dr. Hutchison also stated, in the MSS, that "objective medical evidence" showed Yandell had difficulty walking, low back pain, bilateral lower extremity pain and weakness, left foot drop, depression, gastroesophageal reflux disease, and arthritis. (R. at 522). Dr. Hutchison's observations are supported by his extensive treatment records over a seven-year period (as discussed above), as well as two CT scans of the lumbar spine. On multiple occasions from 2008 to 2015, his treatment notes report tenderness in Yandell's lumbar paraspinal area. (R. at 375, 376, 377, 378, 379, 413, 416, 420, 430, 449, 456, 459). *Thus, the ALJ's statement that Dr. Hutchison did not base his opinion on clinical findings is flatly incorrect.*

9

Dr. Hutchison's MSS is also supported by medical evidence from other examining and treating sources. In August 2005, Yandell's primary care physician at the time, George Patton, M.D., told her she would be taking anti-inflammatory drugs for hip and leg pain "the rest of her life." (R. at 403). In May 2006, Dr. Patton said that, "undoubtedly [Yandell] suffers from subtle deficits that will wax and wane, probably get worse over time and may be exacerbated by weather or specific activity." (R. at 397). As discussed, her pain and limitations did worsen over the years to the point that Dr. Hutchison was required to prescribe hydrocodone, to go along with her anti-inflammatory medication. She began experiencing difficulties with her activities of daily living and, at some point, she began using a cane to ambulate.

Similarly, Yandell's limitations are further supported by a February 2009 orthopedic consultative evaluation performed by Patricia Knott, M.D. Dr. Knott noted decreased strength and sensation in Yandell's right lower extremity, a positive straight leg raise test at thirty degrees, decreased strength and grasp in the right upper extremity, difficulty with heel and toe walking, and reduced lumbar range of motion. (R. at 245, 247).

After erroneously discrediting Dr. Hutchison's opinion because it allegedly lacked any "clinical findings," the ALJ stated that no other examining physician had assessed limitations greater than those described in the ALJ's RFC. (Tr. 30). *This is*

*also factually incorrect.* Dr. Knott, the consultative orthopedist, opined that Yandell could never stoop and could only occasionally reach, engage in fine manipulation, and push/pull/operate controls with her hands or feet. (R. at 247A). The ALJ's RFC limits Yandell to occasional stooping and contains no limitations on the other functions noted by Dr. Knott.

*The ALJ also erroneously stated that, if Yandell were experiencing severe pain, "it is reasonable to assume she would report this information to her doctor and her medication would be adjusted accordingly," which did "not appear to be the case."* (R. at 29). As discussed, Yandell *did report* to Dr. Hutchison in 2012 that her pain had intensified and, in response, he began prescribing a narcotic (hydrocodone), in addition to the anti-inflammatory medication that she had been taking for years.

Finally, in his decision, the ALJ referred to multiple pieces of evidence that are *unavailable for review*. (R. at 24, 29). These exhibits were discussed in earlier ALJ decisions that were *reversed* by the Commissioner, but *the exhibits themselves* have been lost during the course of the multiple Appeals Council remands to which this case has been subject. *It was an obvious and serious error for the ALJ to rely on the hearsay conclusions or statements of earlier ALJs (who were later reversed) about evidence that has been lost as this case bounced back and forth between ALJs and the Appeals Council over the last thirteen years.*

11

Yandell argues that, due to the ALJ's errors, she is entitled to an immediate award of benefits, rather than further prolonging the administrative review process. The Court agrees.

After thirteen years of administrative errors and bureaucratic wheel-spinning, the ALJ in this case came face to face with a record that overwhelmingly supported a finding that Yandell was disabled. Rather than awarding disability, the ALJ went to great lengths to make flatly erroneous findings which appear to have been designed to avoid granting Yandell disability, notwithstanding the "clear weight" of the evidence supporting her claim. As discussed, Dr. Hutchison's opinion was directly supported by the opinion of an orthopedic specialist (Dr. Knott) and other evidence in the record, which documented the steady decline of her chronic conditions and accompanying functional limitations. Ignoring the great weight of the medical evidence, the ALJ determined that Yandell retained the RFC to perform a *limited range* of unskilled sedentary work, something the limitations found by Dr. Hutchison and Dr. Knott would make impossible. Thus, the Commissioner failed to meet her burden of proving that jobs exist in the national economy that Yandell is capable of performing.

As the Eighth Circuit held in *Hutsell v. Massanari,* 259 F.3d 707, 714 (8th Cir. 2001), an order remanding for an award of benefits is appropriate when the "clear weight of the evidence points to a conclusion that [the claimant] is disabled,"

and further administrative hearings "would merely delay receipt of benefits." *Id.* In *Hutsell,* the claimant had "gone through three administrative hearings, three appeals to the Appeals Council, and many psychological evaluations," with no medical evidence demonstrating that she could engage in work on a sustained basis. Thus, the Court remanded for an immediate award of benefits rather than "prolong this case into its second decade." *Id.* at 713-14.

Similarly, in *Ingram v. Barnhart*, 303 F.3d 890, 894 (8th Cir. 2002), the Court noted that, although "[n]ormally" it would remand to the SSA to correctly apply the governing law regarding obesity, "this case is anything but normal," due to the SSA's "inexcusably slow" handling of the claimant's claims over a nine-year period; its failure to timely assert certain arguments; and "unequivocal" evidence that the claimant met the requirements of a listing. *See also Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir. 2004) (remanding for the Commissioner "to decide the issue again would create an unfair 'heads we win; tails we play again' system of disability benefits adjudication"); *Seavey v. Barnhart,* 276 F.3d 1, 13 (1st Cir. 2001) (recognizing the "equitable power to order benefits in cases where the entitlement is not totally clear, but the delay involved in repeated remands has become unconscionable").

The thirteen-year delay in this case is even more egregious than the delays in *Hutsell* and *Ingram*. There were four administrative hearings, adverse decisions by

13

four different ALJs, two Appeals Council remands, and an erroneous Appeals Council dismissal, which delayed the proceeding for two years before the Appeals Council discovered its error. The SSA's loss of the administrative record and its inability to locate or reconstruct the missing records added considerably to the delay, and frustrated administrative and judicial review. Because the "clear weight" of the evidence in this case supports disability, a remand would only delay matters and force Yandell to play another round of what the Ninth Circuit elegantly described as a "'heads, we win; tails we play again' system of disability benefits adjudication." *Benecke*, 379 F.3d at 595.

### III. Conclusion

ACCORDINGLY, IT IS THEREFORE ORDERED THAT the Commissioner's decision be, and it hereby is, REVERSED and REMANDED with instructions to grant an immediate award of benefits to Yandell.

It is so ordered this 15th day of August, 2017.

_____
UNITED STATES MAGISTRATE JUDGE